UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Eric Scott Knutson, | Case No. 22-cv-185 (JRT/ECW) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Paul Schnell et al., | |
| Defendants. | |

This matter is before the Court on Defendants' Motion for Summary Judgment (Dkt. 29); Defendants' Motion for a Stay of Discovery (Dkt. 38); and Defendants' Motion to Modify the Scheduling Order (Dkt. 46). The case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons stated below, the Court recommends dismissal of this action.

    **I.    FACTUAL AND PROCEDURAL BACKGROUND**

**A.    Allegations and Relief Sought in Plaintiff's Complaint**

Plaintiff Eric Scott Knutson ("Knutson" or "Plaintiff") has brought a Complaint for Violation of Civil Rights under 42 U.S.C. § 1983 against Defendants Guy Bosch, Sara Hard, Joel Harrington, Andrew Reed, Paul Schnell, and Keith Wieken (collectively, "Defendants"). (Dkt 1.) The Complaint alleges as follows:

> A.    Commissioner of Corrections Paul Schnell; Warden of Operations Guy Bosch; and Program Director Andrew Reed failed to provide an adequate classification system. This resulted in my placement into the most

violent unit in MCF-Stillwater even though there was an obvious risk to my safety because of the identifiable group I fell under and because of a previous assault which was closely related in time. While in Segregation, prior to the assault in question, I had made multiple requests for placement into a more protected unit but these requests were denied by Program Director Reed.

* * *

B: On 06/19/2020 at approximately 2:17 p.m.: Commissioner of Corrections Paul Schnell, Warden of Operations Guy Bosch, Corrections Officer Keith Weiken, Corrections Officer Sara Hard, Corrections Officer Joel Harrington and any other Corrections Officer in the A-West unit at that time failed to provide adequate supervision of inmates which resulted in me being severely assaulted. The A-West unit was on a modified lockdown due to Covid 19 protocol, which allowed only half of the unit to be out of their cells at a time, promoting social distancing. At that approximate time, the officers either noticed and neglected to act, or failed to notice an inmate tier violate, proceed onto my tier, and run into my cell where he severely assaulted me with a razor shank nearly killing me. He then remained disregarded or unnoticed as he ran back out of my cell and return to his own cell with all the other inmates watching the assault and the aftermath. Clearly visible and with a blood-soaked towel wrapped around my head, I walked approximately 150 feet from my cell to the officer's desk in the middle of the unit with officers still disregarding or failing to notice me and my injuries until I was directly in front of them verbally addressing that I needed medical help.

C: On 06/19/2020 all of the previously listed defendants failed to protect me from being severely assaulted with a razor shank, resulting in hours of surgery and nerve repair from 7 major lacerations to my face and 1 to my upper chest. Prior to my placement into the A-West unit, I had made multiple requests by kite to Program Director Reed advising him that I did not feel safe in any other unit aside from Cell Hall D. All of my requests were denied and I was not offered placement. The DOC then continually gave me more segregation/discipline time for refusing placement into other units. This continued discipline for refusing placement rather than putting me on an administrative segregation status, forced me to go back into general population. At the time of that placement, because of the known risks for my safety, an effort to inform the officers in that unit of that possible risk needed to and should have been made.

(Dkt. 1 at 4, 8.)[1] Knutson seeks monetary damages for the physical and mental trauma suffered as a result of the violation of his civil rights and for his ongoing medical care. (*Id.* at 5.)

Knutson also alleges that he followed the chain of command and all rules set forth in the Minnesota Department of Correction's ("MDOC" or "DOC") grievance procedure, but that the grievance was denied as a formal grievance. (*Id.* at 3.) Knutson does not assert in his Complaint that his ability to engage in the grievance process was impeded by Defendants or any other relevant individual. Attached to the Complaint was a Minnesota Correctional Facility("MCF")-Stillwater Office Memorandum informing Knutson that the grievance submitted would not be entered as a formal grievance because he failed to file it within 30 calendar days from the date of the incident, and because he did not attach copies of all of the kite responses received in the chain of command. (Dkt. 1-1.)

**B.     MDOC Grievance Policy 303.100**

MDOC Policy 303.100 applies to all MDOC prisons and inmates for the administrative adjudication of grievances from incarcerated persons, including Knutson during all times relevant to the facts alleged in his Complaint. (Dkt. 31 ¶¶ 4, 11.) Information regarding MDOC Policy 303.100 is included in MCF-Stillwater's MDOC Adult Faculties Offender Handbook, which is provided to incarcerated persons upon their admission to MCF-Stillwater. (Dkt. 31 ¶ 3; Dkt. 31-1 at 16.) If an inmate in the Restrictive Housing unit at MCF-Stillwater had a specific personal safety concern about a

---

[1]      Unless otherwise indicated, all page number citations to the record are to the CM/ECF pagination.

living unit assignment, or specific safety concern about another incarcerated person, that person could raise those concerns through the DOC's grievance procedure. (Dkt. 34 ¶ 7.)

Pursuant to MDOC Policy 303.100, the first step offenders must take to resolve issues related to their confinement is to send kites to the staff person(s) responsible for whatever program, service, or condition is involved, as indicated on the Facility Chain of Command. (Dkt. 33-1, Ex. A at 2.) MCF-Stillwater has a chart that identifies specific chains of command for different areas and programs within the prison. (Dkt. 31 ¶ 6; Dkt. 31-1, Ex. C at 17.) The incarcerated person must use a MDOC kite form, which is available in each living unit at MCF-Stillwater. (Dkt. 31 ¶ 5.) If an incarcerated person does not receive a response to their kite, after waiting at least 5 working days, the person may proceed to the next staff in the chain of command. (Dkt. 33-1, Ex. C at 10.)

When an inmate is unable to informally resolve an issue or complaint, for which there is no review or appeal procedure provided by a separate policy (such as the classification system, addressed *infra*), the next step offenders must take to resolve issues related to their confinement is to submit a facility grievance. (Dkt. 33-1, Ex. A at 2-3.) "Offenders must submit a facility grievance to the facility grievance coordinator within 30 calendar days of when the issue most recently occurred and no sooner than seven calendar days of when they sent a kite trying to resolve the issue."[2] (*Id.* at 3.) The

---

[2] Offenders who have received threats to their physical safety or well-being, or who can establish that they would be in danger if their complaint were to be known at the facility, may submit their facility grievance on the Facility Grievance form directly to the department grievance appeal authority at the DOC's Central Office in a sealed envelope marked "Special Mail." (Dkt. 33-1, Ex. A at 3.) The 30-calendar day deadline set forth above also applies to this type of grievance. (Dkt. 33 ¶ 7.)

4

grievance "must attach all kites following the chain of command and responses and any other relevant documents. . . ." (*Id.* at 1.)

At MCF-Stillwater, the grievance coordinator receives all facility grievance forms and reviews them for completeness and suitability for the grievance process. (Dkt. 31 ¶ 8; Dkt. 33 ¶ 8; Dkt. 33-1, Ex. A at 3.) If a facility grievance is not acceptable as submitted, the grievance is returned to the individual with an explanation stating the reason and, if applicable, with instructions for how to remedy the grievance's deficiency. (Dkt. 31 ¶ 8; Dkt. 33 ¶ 8; Dkt. 33-1, Ex. A at 3.)

Offenders who are not satisfied or disagree with the response from the facility grievance authority may submit a grievance appeal to the grievance appeal authority at the DOC's Central Office using grievance appeal forms, in compliance with instructions, and within the time periods allowed. (Dkt. 33-1, Ex. A at 5.) Offenders must submit the grievance appeal by mail to the grievance appeal authority within 21 calendar days of the date the facility grievance authority signed the response. (*Id.*) Any grievance appeal must include a list of all the documents that were submitted with the facility grievance. (*Id.*)

The appeal decision by the DOC's Central Office is considered the DOC's final response. (Dkt. 31 ¶ 10.) When the MDOC's Central Office receives a grievance appeal, it is reviewed and tracked by the grievance appeal coordinator. (Dkt. 33 ¶ 8.) If the grievance appeal is not complete as submitted or if it does not comply with the grievance procedures, it is returned to the incarcerated person with an explanation as to

5

why the grievance appeal was returned and, if applicable, with instructions how to properly complete the grievance appeal. (*Id.*)

C.    **MDOC Classification System Policy 202.100**

The MDOC has set forth guidelines under Policy 202.100 for assigning custody classification levels to offenders based on objective criteria. (Dkt. 32-1 at 1; *see also* Dkt. 32 ¶ 3.) The classification level is the degree of supervision required for each offender as determined by the department's classification system. (Dkt. 32-1, Ex. A at 1.)

Inmate classification is initially performed at the time of intake. (Dkt. 32 ¶ 6.) During the classification process, "points" are assigned to an inmate based on a number of factors, including: a) behavioral characteristics of the offense of incarceration; b) history of documented criminal behaviors within the prior ten years; c) custodial behavior during any period of incarceration within the prior five years; d) escape behaviors during the prior five years; e) the incarcerated person's most recently assigned custody level; f) the incarcerated person's age; g) any system requirements that require classification at a particular level or higher; and h) the needs of the incarcerated person and the department. (Dkt. 32-1, Ex. A at 2; *see also* Dkt. 32 ¶ 4.) Based on the total number of points, a score is created, and a classification level is assigned. (Dkt. 32 ¶ 5.)

Classification levels are divided into levels 2 through 5 and are used to determine whether an offender should be placed in minimum, medium, close, or maximum custody. (Dkt. 32-1, Ex. A at 1; *see also* Dkt. 32 ¶ 5.) MCF-Oak Park Heights is a level 5, maximum security facility, and MCF-Stillwater and MCF-Rush City are both level 4,

6

close security facilities. (Dkt. 32 ¶ 5.) The MDOC has a number of minimum, medium, and close security facilities, including three level 4 facilities, and generally, inmates are assigned to a facility that matches their classification level and are placed at a particular facility of that level according to available space and an individual's needs. (*Id.* ¶ 6.) An individual's classification level does not determine their eventual living unit assignment within the facility to which they are assigned. (*Id.*) Under MDOC Policy 202.100, certain disciplinary infractions can result in a reclassification once discipline is imposed—including when an incarcerated person is disciplined with segregation, extended incarceration, or other qualifying sanctions specified in the Classification Discipline Outline for a rule violation—where that person is assigned a new classification score and level. (Dkt. 32-1, Ex. A at 3, Ex. B at 5; *see also* Dkt. 32 ¶¶ 7-10.)

An inmate may appeal an assigned classification level, pursuant to MDOC Policy 202.100, as follows:

> Classification Level Appeals. An offender may appeal an assigned classification level as follows:
>
> 1. The offender must notify the caseworker of his/her disagreement with the classification level, and the caseworker forwards a copy of the Classification Appeal Report (attached) to the offender.
>
> 2. The offender has six months to file an appeal from the most recent classification action.
>
> 3. The offender must complete the top portion of the form and return it to the classification officer.
>
> 4. The classification officer reviews the form, makes a recommendation to deny or approve the appeal, and forwards

7

            the form to the classification steering committee for a final decision.

     5.     The classification steering committee approves or denies the appeal and returns the results to the classification officer.

(Dkt. 32-1, Ex. A at 3-4.)

**D.    Knutson's Exhaustion of Administrative Procedures**

Knutson asserts in his Complaint that prior to his placement into the A-West Unit and attack by another inmate, he "had made multiple requests for placement into a more protected unit but these requests were denied by Program Director Reed." (Dkt. 1 at 8.) These alleged kites were not attached to the Complaint. (Dkt. 1-1.) During the events in question, Defendant Andrew Reed ("Reed") was employed as a Corrections Program Director at MCF-Stillwater. (Dkt. 34 ¶ 1.) As part of his duties, Reed oversaw the Cell Hall-D and Restrictive Housing living units. (*Id.* ¶ 2.) Reed asserts in his declaration that he did not remember receiving kites from Knutson in June 2020 or in the months prior to the June 19, 2020 incident about his current or upcoming living assignment or about personal safety concern issues, and did not have record of any such kites from this time period. (*Id.* ¶ 14.) According to Reed, if he had received kites from Knutson, he would have responded to him and returned the kite to him so that he could include his response with any additional kites or grievances that he submitted. (*Id.*)

As alleged in the Complaint, Knutson's placement into the A-West Unit at MCF-Stillwater, and assault against him by another prisoner occurred on or before June 19, 2020. (Dkt. 1 at 8.) The undisputed facts show that Knutson attempted to submit two

facility grievances while incarcerated at MCF-Stillwater. (Dkt. 31 ¶ 13.) The first, and only grievance relevant to the Complaint, dated February 3, 2021, asserted the following:

> In June of 2020, while being housed in A-West, I was assaulted by another inmate while in my cell. He used a boxcutter and stabbed and slashed my face and upper chest resulting in 8 severe lacerations/wounds. The inmate tier violated in order to get to my cell but this went unnoticed by staff on duty. I was bleeding profusely and this went unnoticed by staff as well, until I was directly in front of the desk and got their attention. I was rushed by ambulance to Regents Hospital where I underwent surgery to repair the damages. I have clearly visible scars on my face and chest now because of the assault, but if it wasn't for me being able to get down to the desk in time, it is clear that I would have died from blood loss. A month prior to this, I was jumped and assaulted in my cell in D-hall as well. Photos were taken and it was documented. Because of this and because of the "identifiable" group of prisoners I fell under staff should have recognized the risk of harm and failed to protect me. It was clearly obvious to all the inmates of what was going to, and did happen; so it should have been obvious to staff. If staff had been paying attention they would have seen inmate Turner tier violate and run into my cell with a weapon in hand and it is possible that this action could have been prevented. And because of the severity of my wounds and the amount of blood I was losing, this would have went noticed by officers immediately if they were paying attention. They didn't notice anything until I was directly in front of them. The unit was on a modified schedule due to Covid19 so officers only had half of the unit to monitor. It is beyond a reasonable doubt that they were all inattentive, and/or did nothing. I have written kites to all officers involved and have followed the D.O.C. chain of command but have received no response to these actions.

(Dkt. 31-1, Ex. D at 20-21.) Based on the record, no kites were attached to this grievance (Dkt. 31 ¶ 13), although Knutson alleges he "[f]ollowed the chain of command and all other rules set forth in the D.O.C. grievance procedure" (Dkt. 1 at 3 ¶ C). The MDOC responded to this grievance on February 8, 2021. (Dkt. 1-1; Dkt. 31-1, Ex. D at 18.) Knutson was notified that the grievance he submitted would not be entered as a formal grievance because he was required to file a grievance "within 30 calendar days from the date the incident occurred," making the February 3, 2021 grievance untimely, and

9

because he failed to attach all of the kite responses he received from the appropriate chain of command. (*Id.*) Knutson did not re-submit the grievance with the kites attached. (Dkt. 31 ¶ 13.)

On March 1, 2021, the MDOC's Central Office received a grievance appeal from Knutson. (Dkt. 33 ¶ 10.) Knutson's communication accompanying the grievance appeal to the DOC's Central Office, dated February 19, 2021, provides:

> I have enclosed my initial grievance and my grievance appeal. I no longer feel comfortable keeping this issue at a facility level. I fear that there may be some kind of retaliation by officers or staff and do not want any more conflicts, especially because of vindictiveness. Please enter my grievance and the grievance appeal.

(Dkt. 33-1, Ex. D at 13.) The February 3, 2021, grievance was attached, as well as the grievance appeal. (*Id.* at 14-16.) In his February 19, 2021 grievance appeal, Knutson stated as follows:

> I am appealing the decision to not enter the grievance I submitted, formally, for the following reason: Since the assault, I have written kites to staff, officers involved, in an attempt to follow the chain of command but have not received responses from anyone. I have even written kites to staff outside the chain of command, ie: caseworker, discipline and AWAT Wanchena but have not gotten any answers or my requests fulfilled. I did everything as policy 303.100 requires in regards [sic] to my grievance, but because of staff's deterance [sic] I am outside the 30 day window for filing it. I cannot be found to be at fault. I am also appealing the denial of any wrongdoing by DOC staff involving this assault. Because of the staff on duty's inattention I now have visible cars all over my face and my upper chest. I also suffered nerve damage to my face and I can no longer do things like whistle, pucker my lips, and I no longer have a complete smile. Mentally, I am now paranoid and no doubt have PTSD. This trauma has altered my perception of myself, those around me, and how I project life. I also fear that because of this grievance there might be some kind of retaliation by staff and I may be in danger, especially considering the fact that no one will respond to me or my kites. I do not want any conflicts involving staff.

(Dkt. 33-1, Ex. D at 16.)  The grievance appeal was returned to Knutson because the issue he attempted to grieve occurred in June 2020, and the timeframe to file a grievance had passed.  (*Id.* at 12.)

The DOC records do not reflect that Knutson ever challenged his classification score through the available administrative procedure under MDOC Policy 202.100.  (Dkt. 32 ¶¶ 16, 17.)  This includes no record of Knutson raising any disagreement regarding his classification score to his caseworker or of Knutson filing an appeal of his classification score to the classification steering committee for its review at any time.  (*Id.*)

## II.    LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party has the initial responsibility of demonstrating that there is no genuine issue of material fact to be decided.  *See Celotox Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  For a dispute about a material fact to be "genuine," the evidence must be such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby*, 477 U.S. 248 (1986).  In its review of the facts, the Court must consider the evidence in the light most favorable to the party opposing summary judgment.  *See Kneibert v. Thomson Newspapers, Michigan, Inc.*, 129 F.3d 444, 451 (8th Cir. 1997).

When a motion for summary judgment has been made and supported by the pleadings and affidavits as provided in Rule 56(c), the burden shifts to the party opposing the motion to proffer evidence demonstrating that a trial is required because a disputed issue of material fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

11

574, 586-87 (1986).  "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).  "In evaluating the evidence at the summary judgment stage, we consider only those responses that are supported by admissible evidence."  *Duluth News-Tribune v. Mesabi Publ'g Co.,* 84 F.3d 1093, 1098 (8th Cir. 1996); *see also JRT, Inc. v. TCBY Sys., Inc.*, 52 F.3d 734, 737 (8th Cir. 1995) ("[A] successful summary judgment defense requires more than argument or re-allegation; [the party] must demonstrate that at trial it may be able to put on admissible evidence proving its allegations.").  Indeed, Rule 56(c) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated" and a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  *See* Fed. R. Civ. P. 56(c)(2), (4).

When ruling on a motion for summary judgment, the Court is not required to adopt the plaintiff's version of the facts when those facts are "so 'blatantly contradicted by the record . . . that no reasonable jury could believe them."  *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790 (8th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  "A plaintiff may not merely point to unsupported self-serving allegations but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor' without resort to 'speculation, conjecture, or fantasy.'"  *Id.* at 790-

12

91 (citations and internal quotation omitted).  When considering a motion to dismiss or for summary judgment, pleadings submitted by *pro se* litigants are held to less stringent standards than formal pleadings drafted by lawyers.  *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam).  Nevertheless, claims of even a *pro se* plaintiff cannot survive a motion for summary judgment unless the plaintiff has set forth specific facts demonstrating that there is a genuine issue for trial.  *See Quam v. Minnehaha Cty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987) ("Although Quam is entitled to the benefit of a liberal construction of his pleadings because of his pro se status, Federal Rule of Civil Procedure 56 remains applicable to Quam's lawsuit.").

Moreover, "failure to oppose a basis for summary judgment constitutes a waiver of that argument." *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009).  Here, Knutson has failed to oppose summary judgement.

### III.   ANALYSIS

Defendants argue that the Court should grant the DOC Defendants' motion for summary judgment and dismiss Knutson's Complaint because Knutson failed to exhaust MDOC administrative remedies that were available to him, as is required under the Prison Litigation Reform Act of 1995 ("the PLRA").  (Dkt. 30 at 15-17.)

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Under the PLRA, exhaustion is required regardless of the nature of the relief the prisoner seeks.  *See Porter*

13

*v. Nussle*, 534 U.S. 516, 524, 532 (2002) ("[W]e hold that the PLRA's exhaustion requirement applies to all inmate suits about prison life . . . whether they allege excessive force or some other wrong."). The PLRA exhaustion requirement also applies regardless of the relief the prisoner is seeking. *See Booth v. Churner*, 532 U.S. 731, 741 (2001) (citation omitted). The failure to exhaust the available administrative remedies as required by the PLRA is an affirmative defense, with the burden of proof falling on a defendant, and not a matter of subject matter jurisdiction. *See Lenz v. Wade*, 490 F.3d 991, 993 n.2 (8th Cir. 2007) (citation omitted).

The PLRA requires "proper exhaustion," which "demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). The PLRA does not specify an exhaustion procedure; for a prisoner's claims to be considered administratively exhausted, the prisoner must follow the grievance procedure of the facility where they are incarcerated. *Jones v. Bock*, 549 U.S. 199, 218 (2007) ("[P]risoners must complete the administrative review process in accordance with the applicable procedural rules. . . .") (marks and citation omitted). "An inmate satisfies § 1997e(a) by pursuing 'the prison grievance process to its final stage' to 'an adverse decision on the merits.'" *Porter v. Sturm*, 781 F.3d 448, 451 (8th Cir. 2015) (quoting *Burns v. Eaton*, 752 F.3d 1136, 1141 (8th Cir. 2014)). "It does not matter that the inmate 'subjectively believed that there was no point in his pursuing administrative remedies.'" *Id.* (quoting *Lyon v. Vande Krol*, 305 F.3d 806, 809 (8th Cir. 2002).

14

The exhaustion "edict contains one significant qualifier: the remedies must indeed be 'available' to the prisoner. But aside from that exception, the PLRA's text suggests no limits on an inmate's obligation to exhaust—irrespective of any 'special circumstances.'" *Ross v. Blake*, 578 U.S. 632, 639 (2016) (citations omitted). Administrative exhaustion procedures may not be "available" for purposes of the PLRA when: (1) the procedure would be a "dead end" because officers are unable or unwilling to provide relief; (2) the procedure is so opaque as to become "incapable of use"; or (3) prison officials prevent a prisoner from utilizing the procedure through "machination, misrepresentation, or intimidation." *Id.* at 640-46; *see also Porter*, 781 F.3d at 452 (quoting *Gibson v. Weber*, 431 F.3d 339, 341 (8th Cir. 2005) ("Inmates are excused from exhausting remedies 'when officials have prevented prisoners from utilizing the procedures, or when officials themselves have failed to comply with the grievance procedures.'")).

Defendants assert that the MDOC's grievance procedures were available to Knutson, as is evidenced by his rejected grievance, but that Knutson inexplicably waited more than six months after the assault to file the grievance, making the grievance untimely under MDOC Policy 303.100. (Dkt. 30 at 17-18.). Defendants also point to the fact that the grievance was returned to Knutson because he did not attach copies of the kite responses from the chain of command, as is required by the MDOC Policy 303.100. (*Id.* at 18.) Because the facility grievance was untimely, and because the grievance did not adhere to the MDOC's grievance policy, Defendants contend that Knutson did not adequately grieve his failure to protect claim against MDOC Defendants, and this Court should dismiss this claim. (*Id.*)

15

Indeed, according to the Complaint, the assault at issue happened on June 19, 2020. (Dkt. 1 at 8.) However, Knutson did not submit the relevant grievance until February 3, 2021. (Dkt. 31 ¶ 13; Dkt. 31-1 at 20-21.) As stated previously, pursuant to MDOC Policy 303.100, offenders must submit a facility grievance to the facility grievance coordinator within 30 calendar days of when the issue most recently occurred. (Dkt. 33-1, Ex. A at 3.) Even assuming that Knutson received a threat to his person making him unwilling to submit a facility grievance, a grievance directly to the DOC's Central Office would have also been due no later than 30 days after the event at issue. (Dkt. 33 ¶ 7; Dkt. 33-1, Ex. A at 3.) Knutson has not given any reason why he did not grieve the June 2020 incident earlier. Not only was the grievance at issue inexplicably over six months late, but the grievance also failed to attach any kites, as required by MDOC Policy 303.100. (Dkt. 33-1, Ex. A at 1.) As such, the undisputed evidence supports a finding that Knutson's grievance did not constitute "proper exhaustion" for the purposes of the PLRA. *See Woodford*, 548 U.S. at 90-91; *see also Fields v. Berts*, No. 20-CV-2227 (ECT/JFD), 2022 WL 18539643, at *7 (D. Minn. Dec. 29, 2022), *R. & R. adopted*, 2023 WL 1421658 (D. Minn. Jan. 31, 2023) ("Because Mr. Fields cannot exhaust his administrative remedies regarding these claims—he cannot turn back time and submit a timely grievance—the undersigned recommends that the dismissal of Mr. Fields's claims be with prejudice."); *Fisherman v. Rasmussen*, No. 12-2554 (JRT/JSM), 2013 WL 3354509, at *9 (D. Minn. July 3, 2013) (finding a failure to exhaust where the plaintiff "filed an untimely grievance form that did not comply with the MNDOC's

16

grievance procedures in that the grievance form was submitted well beyond the 30-day deadline and because of his failure to try to informally resolve the issues.").

Nor can this Court find that Knutson attempted in any way to exhaust his classification for the purposes of his placement, as alleged in his Complaint, because there is no evidence in the record, let alone any allegation in his Complaint, that he ever challenged or appealed his classification through the available administrative procedure. Instead, the undisputed evidence in the record is that MDOC records do not reflect that Knutson ever challenged or appealed his classification through the available administrative procedure; there is no record of Knutson raising his disagreement regarding his classification score to his caseworker; and there is no record of Knutson filing an appeal of his classification score to the classification steering committee for its review at any time. (Dkt. 32 ¶ 16.)

The next issue is whether the MDOC remedies were even available to Knutson. In his Complaint, Knutson asserts that "[p]rior to my placement into the A-West unit, I had made multiple requests by kite to Program Director Reed advising him that I did not feel safe in any other unit aside from Cell Hall D. All of my requests were denied and I was not offered placement." (Dkt. 1 at 8.) In his grievance, Knutson claimed that he had written kites to all officers involved and had "followed the D.O.C. chain of command but have received no response to these actions." (Dkt. 31-1, Ex. D at 21.) In addition, as part of his grievance appeal, Knutson claimed that he had "written kites to staff, officers involved, in an attempt to follow the chain of command but ha[d] not received responses from anyone" and it was because of staff's conduct that he was outside the 30-day

17

window. (Dkt. 33-1, Ex. D at 16.) Knutson provided no evidence in opposition to summary judgment in support of these assertions, which are contradicted by Reed's assertion that he received no kites from Knutson. (Dkt 34 ¶ 14.) "[A] plaintiff must present some evidence, other than mere conclusory statements, to demonstrate that he was precluded from fully exhausting his administrative remedies." *Gisege v. Minnesota Department of Corrections*, Civ. No. 06–1353 (JRT/RLE), 2007 WL 2892024 at *11 (D. Minn. Sept.28, 2007); *see also Gibson v. Weber*, 431 F.3d 339, 341 (8th Cir. 2005) (upholding summary judgment where plaintiffs presented no evidence that any prison official thwarted an attempt to initiate the procedures or that any official made it impossible for them to file grievances); *Boyles v. Park*, 111 F. App'x 861 (8th Cir.2004) ("Further, while there was some evidence in the record below about problems with the grievance process, the evidence was not specific enough to show that prison officials had prevented Boyles from administratively exhausting the issues he raised in the instant lawsuit.").

However, even assuming what Knutson asserts is true, under Policy 303.101, dealing with kites, offenders must follow the chain of command, contact only one staff member at a time and should "allow five working days," prior to writing the next staff in the chain of command. (Dkt. 33-1, Ex. C at 10.) Knutson then could have submitted his grievance with the unanswered kites attached in a timely manner. (Dkt. 33-1, Ex. A at 1; Dkt. 34 ¶ 4.) So not only is Knutson's assertion that he needed to wait over six months to determine that staff was not going to respond to his grievance implausible, but the six-

month delay was also not required under MDOC Policy in order to file a grievance. Any subjective belief to the contrary by Knutson is irrelevant. *See Porter,* 781 F.3d at 451.

The Court acknowledges that Knutson intimates in his letter to the DOC's Central Office submitting his appeal, and as part of the appeal itself, that he "fear[ed] that there may be some kind of retaliation by officers or staff and [did] not want any more conflicts, especially because of vindictiveness" and that "because of this grievance there might be some kind of retaliation by staff and [he] may be in danger, especially considering the fact that no one will respond to me or my kites." (Dkt. 33-1, Ex. D at 13, 16.) However, to the extent that Knutson is asserting that his fear of retaliation kept him from properly following the MDOC guidelines in bringing a proper and timely grievance, "[t]here must be some basis in the record from which the district court could determine that a reasonable prisoner of ordinary firmness would have understood the prison official's actions to threaten retaliation if the prisoner chose to utilize the prison grievance system." *East v. Minnehaha Cty.*, 986 F.3d 816, 821 (8th Cir. 2021) (marks and citation omitted). Outside of the above conclusory assertions, there is nothing in the record to support that it was a fear of retaliation that kept Plaintiff from properly using the grievance procedure set forth by MDOC in a timely manner.

In sum, the Court finds that Knutson fails to raise any genuine issues of material fact related to his failure to exhaust administrative remedies for his claims arising out of the June 19, 2020 attack. He failed to properly use the grievance procedure that was available to him, and for this reason, the Court recommends that summary judgment be granted and that the claims in his Complaint be denied with prejudice on the basis that

exhaustion is no longer available to Knutson given that his grievance was untimely. *See Fields*, 2022 WL 18539643, at *7 (citing *Fisherman*, 2013 WL 3354509, at *9).

## IV. RECOMMENDATION

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. Defendants' Motion for Summary Judgment (Dkt. 29) be **GRANTED**;

2. Defendants' Motion for a Stay of Discovery (Dkt. 38) be **DENIED**[3] as moot;

3. Defendants' Motion to Modify the Scheduling Order (Dkt. 46) be **DENIED** as moot; and

4. Plaintiff's Complaint be **DISMISSED WITH PREJUDICE**.

Dated: April 18, 2023                               *s/Elizabeth Cowan Wright*
                                                    ELIZABETH COWAN WRIGHT
                                                    United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).

---

[3] The Court notes that because it recommends granting the Motion for Summary Judgment, the Motion for a Stay of Discovery pending a ruling on summary judgment and Motion to Modify the Scheduling Order should be denied as moot.